JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.
**125 In State v. A.G.D., this Court held that "[t]he government's failure to inform a suspect that a criminal complaint or arrest warrant has been filed or issued deprives that person of information indispensable to a knowing and intelligent waiver of rights." 178 N.J. 56, 68, 835 A.2d 291 (2003). Defendant Adrian Vincenty **126 argues that two detectives failed to inform him of the criminal charges filed against him when they interrogated him *1275 and asked him to waive his right against self-incrimination. Relying on A.G.D., Vincenty filed a motion to suppress statements he made to the detectives.
The trial court denied his motion in part and granted it in part. The trial court held that the detectives did not violate A.G.D., but the court suppressed the statements Vincenty made to the detectives after he invoked his right to counsel. Vincenty pleaded guilty to first-degree attempted murder and was sentenced to ten years' imprisonment with an eighty-five percent parole disqualifier. Vincenty appealed the denial of his motion to suppress.
The Appellate Division affirmed the trial court's denial of Vincenty's motion to suppress. According to the Appellate Division, the record showed that Vincenty was informed of the charges pending against him before he waived his right against self-incrimination. Thus, the Appellate Division held, the detectives did not contravene A.G.D.
We disagree. The record reveals that the detectives failed to inform Vincenty of the charges filed against him when they read him his rights and asked him to waive his right against self-incrimination. That failure deprived Vincenty of the ability to knowingly and intelligently waive his right against self-incrimination. Pursuant to A.G.D., Vincenty's motion to suppress should have been granted. We thus reverse the Appellate Division's judgment and remand for further proceedings consistent with this opinion.
I.
A.
Adrian Vincenty was incarcerated at the Garden State Correctional Facility when Detectives Thomas Glackin and Brian Mera visited him to question him about the attempted robbery and attempted murder of Jerry Castellano. Castellano was attacked on **127 March 20, 2011 in Weehawken. Video surveillance of the attack showed two men approach Castellano. The assailants attempted to rob Castellano but were unable to execute the robbery. One of the assailants shot Castellano in the back of the head. One of the assailants wore a mask and dropped or threw it away after the attack. Castellano ultimately survived the attack.
Police officers recovered the mask on the night in question. The mask was tested for DNA -- and Vincenty's DNA was found on it. The detectives also identified Vincenty from the video recording of the attack. The detectives sought to question Vincenty to identify the second assailant on the video recording.
Detective Glackin asked Detective Mera to accompany him to question Vincenty because Vincenty speaks only Spanish and Mera is fluent in Spanish. The detectives recorded the interview. Detective Mera spoke with Vincenty in Spanish.
Detective Mera read Vincenty his Miranda [1] rights -- and Vincenty was given and read a form detailing his rights. The form was written in both English and Spanish. At the bottom of the form, it read: "I acknowledge that I have been advised of the constitutional rights as stated above." Underneath this acknowledgment, Vincenty signed the form.
Detective Mera explained that the police identified Vincenty from the video recording of the attack and sought his assistance to identify the second assailant on the video recording. Detective Mera told Vincenty that "the judge already charged [him]." Detective Mera explained that they obtained Vincenty's DNA from the mask recovered at the scene of the attack. Detective Mera then explained "how DNA
*1276 works" -- that each individual has distinct DNA -- and informed Vincenty that because Vincenty's DNA was discovered at the scene, the detectives "have the charges."
**128 Vincenty indicated that he was confused and denied any involvement in the attack. Shortly thereafter, the following exchange occurred:
Detective Mera: We have you with the DNA and we have you ... with gun charges, right?
Vincenty: Ah huh.
Detective Mera: Okay.
Vincenty: Correct.
Vincenty nonetheless continued to deny any involvement in the robbery. Detective Mera then told Vincenty that they "presented the evidence to the judge," who "put the charges in." Vincenty still indicated that he was "surprise[d] that [the detectives] ha[d] ... evidence against [him]." Vincenty was then asked whether he knew the second man in the video:
Detective Mera: [W]e would like to know who you were with that night.
Vincenty: Ah, I don't know about him.
Detective Mera: Okay. You don't know him?
Vincenty: Do you understand me? I was walking, but I did not shoot any one [sic].
The detectives showed Vincenty a picture of the assailants. Vincenty told the detectives one of the assailants "looks like [him]" and that he has a coat similar to one worn by one of the assailants. Detective Mera explained that they had shown a judge all of the evidence because in order for them to speak with Vincenty, "[they] needed the charges." The detectives again attempted to elicit information about the other assailant:
Detective Mera: Who were you with that night?
Vincenty: That was a person from, but I don't know him very well like that. You understand?
Detective Mera: What's his name?
Vincenty: Honestly, I don't know. I met him thru [sic] another friend of mine. Do you understand me?
A few moments later, Detective Mera mentioned that they had charges against Vincenty. Vincenty then stated that he did not get a letter from a judge about the charges and asked the detectives what the charges were. The officers showed Vincenty a list of the charges and explained to Vincenty that he had been charged with attempted homicide, robbery, and conspiracy to commit robbery.
**129 The detectives then asked Vincenty additional questions, attempting to elicit further information about the attack. Vincenty denied any involvement in the robbery but did tell the detectives he lived near the scene of the crime and "went to the store to buy cigarettes." Shortly thereafter, Vincenty told the detectives he wanted to talk to a lawyer and expressed concern that there were charges pending against him.
The detectives continued questioning Vincenty. After the detectives again showed Vincenty a list of the charges against him and continued to ask him to provide information about the attack, Vincenty again asked to speak with a lawyer and indicated that he was both surprised and confused. "I need to see a lawyer," Vincenty explained, "because I am confused right now." The detectives then acknowledged Vincenty's desire to speak with a lawyer and stopped questioning him.
B.
A grand jury indicted Vincenty for first-degree attempted murder, contrary to N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3 ; first-degree armed robbery, contrary to *1277 N.J.S.A. 2C:15-1 ; second-degree conspiracy to commit armed robbery, contrary to N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1 ; second-degree possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4(a) ; and second-degree unlawful possession of a weapon, contrary to N.J.S.A. 2C:39-5(b). Vincenty filed a motion to suppress the statements he made to Detectives Glackin and Mera. Vincenty argued his statements should be suppressed because, in his view, the detectives failed to comply with A.G.D. and failed to cease questioning him when he first asked to speak with a lawyer.
The trial court conducted a hearing where both Vincenty and Detective Mera testified. Vincenty testified that he told the detectives he wanted to speak with a lawyer before they began recording the interview. Detective Mera, however, testified that Vincenty requested to speak with a lawyer at the end of the interrogation only. The State indicated that it would not seek to admit any **130 statements Vincenty made to the detectives after he first requested to speak with a lawyer, as the State conceded that any statements made after that point should be suppressed.
The trial court found that Vincenty's reliance on A.G.D. was "misplaced." In the trial court's view, Vincenty was informed of the charges pending against him "immediately after he signed the waiver and before he made any statements with reference to the incident." The trial court found Detective Mera's testimony -- but not Vincenty's -- credible and found that Vincenty did not ask to speak with a lawyer before the detectives began recording the interview. Under the totality of the circumstances, the trial court found that, until Vincenty requested to speak with a lawyer, his statements were the result of a "knowing, voluntary and intelligent waiver of his Miranda rights." The trial court held that any statements Vincenty made after he first requested to speak with a lawyer would not be admissible during the State's case-in-chief.
Vincenty entered into a plea agreement with the State whereby he pleaded guilty to first-degree attempted murder and reserved his right to appeal the denial of his suppression motion. Under the agreement, the State recommended a sentence of ten years' imprisonment with an eighty-five percent parole disqualifier. The trial court sentenced Vincenty in accordance with the State's recommendation.
C.
Vincenty appealed the trial court's denial of his motion to suppress. Vincenty argued he was not informed of the charges filed against him when he was read his Miranda rights and, thus, the detectives failed to comply with A.G.D. An Appellate Division panel affirmed the trial court's denial of Vincenty's motion to suppress. The panel held that the detectives did not violate A.G.D. because, in its view, the record supported the trial court's finding that Vincenty "was apprised of the charges pending against him before he decided to cooperate with the investigation and provide self-incriminating information."
**131 We granted Vincenty's petition for certification. 232 N.J. 278, 179 A.3d 1040 (2018).
II.
A.
Vincenty argues his motion to suppress should have been granted. Vincenty claims the detectives failed to inform him of the charges pending against him when he was read his Miranda rights. That failure, Vincenty claims, requires the suppression of his statements pursuant to A.G.D. According to Vincenty, the Appellate Division erroneously interpreted his argument as raising a factual dispute when the detectives'
*1278 compliance with A.G.D. is strictly a question of law.
B.
As a threshold matter, the State argues that the trial court's denial of Vincenty's motion to suppress, even if erroneous, was harmless. In the State's view, Vincenty did not offer any inculpatory statements to the detectives, and the denial of his motion to suppress therefore could not have influenced Vincenty's decision to plead guilty. Thus, according to the State, we should summarily affirm the Appellate Division's judgment or dismiss Vincenty's appeal as improvidently granted.
As to the error alleged by Vincenty, the State argues Vincenty knowingly and intelligently waived his Miranda rights when he agreed to speak with the detectives because the detectives informed him of the pending charges. The State argues we should apply a totality-of-the-circumstances analysis, rather than the bright-line, "rigid and inflexible constitutional rule" it claims Vincenty is advancing.
III.
A.
When we review a trial court's denial or grant of a motion to suppress, we "defer to the factual findings of the trial **132 court so long as those findings are supported by sufficient evidence in the record." State v. Hubbard, 222 N.J. 249, 262, 118 A.3d 314 (2015). We disregard, however, findings of fact that are clearly mistaken. Ibid. We review de novo any legal conclusions reached by the trial court. Id. at 263, 118 A.3d 314.
B.
The common law has granted individuals the "right against self-incrimination since colonial times." A.G.D., 178 N.J. at 66, 835 A.2d 291. The Legislature has since codified the right "in our statutes and rules." State v. P.Z., 152 N.J. 86, 101, 703 A.2d 901 (1997) (citing N.J.S.A. 2A:84A-19 ; N.J.R.E. 503 ). The importance of the common law right "is not diminished by the lack of specific constitutional articulation." Ibid. Rather, the "common law privilege against self-incrimination affords greater protection to an individual than that accorded under the federal privilege." In re Grand Jury Proceedings of Guarino, 104 N.J. 218, 229, 516 A.2d 1063 (1986).
We have provided that protection because the right against self-incrimination is "an integral thread in the fabric of [the] common law," State v. Hartley, 103 N.J. 252, 286, 511 A.2d 80 (1986), and "one of the most important protections of the criminal law," State v. Presha, 163 N.J. 304, 312, 748 A.2d 1108 (2000). Accordingly, we maintain "an unyielding commitment to ensure the proper admissibility of confessions." State v. Reed, 133 N.J. 237, 252, 627 A.2d 630 (1993) (quoting Hartley, 103 N.J. at 301, 511 A.2d 80 (Handler, J., concurring in part and dissenting in part) ).
Individuals, as holders of the right, may waive the right against self-incrimination. Presha, 163 N.J. at 313, 748 A.2d 1108. Law enforcement officers must first advise a suspect of the right against self-incrimination before attempting to obtain a waiver of the right. State v. Hreha, 217 N.J. 368, 382, 89 A.3d 1223 (2014) (citing Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ). A waiver of the right against self-incrimination **133 must be knowing, intelligent, and voluntary. Reed, 133 N.J. at 250-51, 627 A.2d 630. The State carries the burden of proving "beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances." Presha, 163 N.J. at 313, 748 A.2d 1108. *1279 IV.
A.
In A.G.D., detectives questioned the defendant at his home about allegations of sexual abuse. 178 N.J. at 59, 835 A.2d 291. The detectives did not tell the defendant that a warrant for his arrest had been issued. Ibid. The defendant agreed to accompany the detectives to the prosecutor's office for further questioning. Ibid. The defendant confessed to the alleged sexual abuse and was subsequently convicted of related offenses. Id. at 60-61, 835 A.2d 291.
Before trial, the defendant moved to suppress his confession, and the trial court denied the motion. Id. at 61, 835 A.2d 291. On appeal, the Appellate Division found that the defendant's right to counsel was not triggered because an indictment had not been issued. Ibid. The panel remanded for a new Miranda hearing because, on the record presented, the Appellate Division could not address the defendant's claim that his confession was coerced. Id. at 61-62, 835 A.2d 291. On remand, the trial court again denied the defendant's suppression motion, and this Court granted his petition for certification. Id. at 62, 835 A.2d 291.
This Court held that the defendant's confession should have been suppressed, id. at 69, 835 A.2d 291, because the "government's failure to inform a suspect that a criminal complaint or arrest warrant has been filed or issued deprives that person of information indispensable to a knowing and intelligent waiver of rights," id. at 68, 835 A.2d 291. If suspects are not informed that a criminal complaint or arrest warrant has been filed against them, they necessarily lack "critically important information" and thus **134 "the State cannot sustain its burden" of proving a suspect has knowingly and intelligently waived the right against self-incrimination. Ibid. Because the detectives failed to inform the defendant that an arrest warrant had been issued, the defendant in A.G.D. was simply unable to execute a knowing and intelligent waiver of his right against self-incrimination. Ibid.
A.G.D. thus calls for law enforcement officials to make a simple declaratory statement at the outset of an interrogation that informs a defendant of the essence of the charges filed against him. That information should not be woven into accusatory questions posed during the interview. The State may choose to notify defendants immediately before or after administering Miranda warnings, so long as defendants are aware of the charges pending against them before they are asked to waive the right to self-incrimination.
B.
Vincenty's interrogation is precisely what A.G.D. prohibits, and it substantiates A.G.D.'s holding. That is to say, Vincenty's interrogation illustrates that suspects cannot knowingly and intelligently determine whether to waive their right against self-incrimination if, when making that determination, they have not been informed of the charges filed against them.
Unaware that charges had been filed against him, Vincenty appeared willing and ready to waive his right against self-incrimination. He signed a form acknowledging that he understood his rights, spoke with the detectives, and did not request to speak with a lawyer. However, when Vincenty was informed of the criminal charges filed against him, everything changed. He appeared shocked and surprised. He seemed to understand for the first time the heightened magnitude of the interrogation. He instructed the detectives that he wanted to speak with a lawyer. His willingness to speak with the detectives dissipated. He was no longer willing to waive his right against self-incrimination.
**135 As that chain of events demonstrates, Vincenty's ability to knowingly and intelligently *1280 decide whether to waive his right against self-incrimination was fundamentally altered when he was informed of the criminal charges filed against him. Rather than inform Vincenty fully of the charges at the outset, the detectives told him at various points during the interrogation that some type of charges were filed against him. It was not until late in the interrogation -- well after the detectives read Vincenty his rights and asked him to waive his right against self-incrimination -- that the detectives detailed the actual charges Vincenty was facing. At the point when the detectives asked Vincenty to waive his right against self-incrimination, they failed to inform him of the specific criminal charges filed against him. Withholding that "critically important information" deprived Vincenty of the ability to knowingly and voluntarily waive the right against self-incrimination.
Stated simply, the State failed to carry its burden of proving beyond a reasonable doubt that Vincenty knowingly and intelligently waived his right against self-incrimination.
C.
The trial court and Appellate Division erred in holding Vincenty knowingly and intelligently waived his right against self-incrimination. The State, however, argues this Court should find the error harmless because, in its view, Vincenty's statements to the detectives were not inculpatory and thus could not have influenced his decision to plead guilty. We decline the State's invitation to find the error harmless.
Vincenty expressly reserved his right to appeal the denial of his suppression motion in the plea agreement. On appeal, the State opposed Vincenty's legal arguments on the merits and did not argue harmless error. We find that the State has waived the harmless error argument -- and we decline to exercise our discretion to reach an issue not raised before the Appellate Division. See State v. Legette, 227 N.J. 460, 467 n.1, 152 A.3d 887 (2017)
**136 (declining to consider an argument raised "for the first time on appeal").
Nor would consideration of harmless error change matters here because the State's arguments are not persuasive. Some of Vincenty's statements could be fairly characterized as inculpatory. When speaking with the detectives, Vincenty indicated that he knew the other assailant and acknowledged that he looked like one of the assailants. Those statements alone could be viewed as inculpatory and militate against a finding of harmless error.
The State's contention that the denial of Vincenty's suppression motion could not have influenced his decision to plead guilty, moreover, is directly refuted by Vincenty's actions. Vincenty reserved the right to appeal the denial of his suppression motion in the plea agreement. He exercised that right and, when the trial court's decision was affirmed, filed a petition for certification with this Court. Vincenty's very conduct reveals that his decision to plead guilty was influenced by the trial court's suppression ruling.
V.
Because Vincenty's motion to suppress should have been granted, we reverse the judgment of the Appellate Division and remand for further proceedings consistent with this opinion.
CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA'S opinion.

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).